**Ricardo JONES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 08–CF–716.

District of Columbia Court of Appeals.

Argued Nov. 23, 2010.

Decided Sept. 1, 2011.

Thomas T. Heslep, Washington, DC, appointed by the court, for appellant.

Michael T. Ambrosino, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, John P. Mannarino, Matthew Cohen, and David Saybolt, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, Associate Judge, RUIZ,* Associate Judge, Retired, and FARRELL, Senior Judge.

FISHER, Associate Judge:

A jury convicted appellant Ricardo Jones of first-degree murder while armed and four weapons charges related to his shooting of David Valentine. He was also convicted of escape. Appellant primarily objects to the trial court's rulings admitting other crimes evidence and expert testimony on firearm and toolmark identification. He also argues that the trial court impermissibly restricted bias cross-examination of two government witnesses. Finding no reversible error on these or the other grounds raised, we affirm.

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

## I. Factual Background

Around noon on July 6, 2005, Edward Davis and his friend David Valentine were walking in their neighborhood, on the 1200 block of Meigs Place, N.E., in the section of the city known as "Trinidad." When they passed Joseph Leaks, a man Mr. Davis had seen in the area several times before, Davis said hello. Without warning, Mr. Leaks turned around and pulled out a handgun. Leaks apologized right away and explained that he "thought [they were] somebody else." Davis and Valentine ignored the apology and continued up the street.

Shortly thereafter, Davis and Valentine walked back down the block. Davis noticed Leaks and appellant (whom Davis had never seen before) standing near Leaks's apartment building. Davis testified that, because Leaks had just brandished a pistol at him, he paid close attention to both men as he and Valentine neared them. According to Davis, Leaks was skinny, over six feet tall, had a shaved head, and wore glasses. On the other hand, Leaks's friend (appellant Jones) was approximately 5'8", with a medium build, and a "strong face."

When Davis and Valentine were about arm's reach away from Leaks and Jones, Leaks attempted to apologize again. Davis ignored Leaks's apology, but Valentine said he would not accept it and asserted, "that wasn't the last gun they made when you got yours." Suddenly, Davis heard "something go bang." Valentine grabbed his chest and said, "you going to shoot me[?] Your man pulled a pistol on me. You're going to shoot me?" Appellant Jones was the only person with a gun out and was "still pointing" it at Valentine as Valentine collapsed to the ground. Jones then stood over the victim and dared him to "say something else[.]" Davis later picked appellant's picture out of a photo array. He also identified appellant at trial.

Immediately after hearing the shot, Roderick Powell, who lived nearby, came outside. He saw a man in the street place a dark object into his waistband. Another man, whom Mr. Powell recognized as one of his neighbors (Leaks), then joined the person with the dark object, and they sped away in Leaks's gray station wagon.

After the shooting, Leaks and Jones went to North Carolina, and they often stayed with Amanda Ward in Reidsville, North Carolina. On August 5, 2005, Jones and Leaks robbed a Check Into Cash store in nearby Greensboro. They shot the security guard as soon as they entered the store, but the guard survived. Store manager Kim Geil testified that each robber carried a pistol and covered his face with black nylons and sunglasses. After collecting money, the men took the security guard's .38 caliber pistol and ran out of the store.

Police soon arrested appellant and Leaks. When Ms. Ward learned of the arrests, she checked her guest room and discovered a bag of live ammunition underneath the bed. Soon thereafter, she found in a vent two socks containing a .45–caliber pistol and a 9–millimeter pistol. (While searching Leaks's home on Meigs Place in July, police had recovered several 9–millimeter cartridges, but they found no .45 caliber ammunition.)

Appellant and Devone Hines occupied the same cell for several weeks. During that time, appellant told Mr. Hines that he had shot and killed a man with a .45–caliber pistol over the July 4th weekend in the District's Trinidad neighborhood. At trial, Hines recounted how appellant told him about the verbal exchange between Leaks and Valentine prior to the shooting and how appellant stood over the victim

and said something to him afterwards. Appellant told Hines that he and Leaks later went to Greensboro, North Carolina, and robbed a check-cashing store. They shot the store's security guard and took his .38–caliber pistol. Appellant mentioned that he again used the .45–caliber pistol and Leaks was armed with a 9–millimeter pistol. Because Jones was not certain he had wiped his fingerprints from the guns, he asked Hines to retrieve them from a vent in North Carolina once Hines was released.

Instead of proceeding to trial, on April 3, 2007, Leaks pleaded guilty to a five-count criminal information that charged escape, obstruction of justice, accessory after the fact to an assault with intent to kill while armed, possession of a firearm during a crime of violence, and second-degree child sexual abuse (for his sexual relationship with a fourteen-year-old girl). Leaks did not testify at Jones's trial.

## II. Firearms and Toolmark Identification Evidence

### A. Background

When Mobile Crime Technician Gerald Wills arrived at the 1200 block of Meigs Place, N.E., paramedics had already rushed Valentine to the hospital, where he later died of the gunshot wound to his chest. Mr. Wills recovered a .45–caliber shell casing and a copper-jacketed bullet from the murder scene. Crime scene investigators in North Carolina recovered a .45–caliber shell casing and bullet as well as a 9–millimeter casing and bullet from the Check Into Cash store.

Using the traditional method of pattern matching, two firearms experts examined this evidence.[1] Neal Morin compared the bullets and shell casings recovered from the North Carolina crime scene to bullets and casings test-fired from the pistols found in Ms. Ward's spare room. Mr. Morin testified that the .45–caliber shell casing and bullet were fired from the .45–caliber pistol he test-fired. His "level of certainty with respect to that conclusion" was 100% or "to the exclusion of all other firearms[.]" Defense counsel did not object to these questions, nor did he move to strike the answers.

Examiner Michael Mulderig used the same methodology and testified that the .45–caliber shell casing and bullet from the District of Columbia crime scene were fired from the same .45–caliber pistol recovered from Ward's home. Like Morin, Mulderig answered "yes" when the prosecutor inquired whether his conclusion regarding the match was "to the exclusion of all other firearms?" When the prosecutor asked Mulderig about his "level of certainty with respect to" his conclusion, defense counsel interjected: "Objection. Foundation." Judge Dixon overruled the objec-

1. The manufacturing process leaves distinct marks inside each firearm, and the firing of ammunition imparts some of those special marks onto expended bullets and shell casings. For example, the manufacturing process leaves "lands, which are raised areas in the [ ] barrel, and grooves which are recessed areas in the barrel. When a bullet is fired through the barrel, then you [ ] get the negative [of the lands and grooves] imprinted onto the bullet itself. . . . This [type of] fine striated detail . . . is the detail [experts] look[ ] for."

When examining a cartridge casing from one crime scene and a gun recovered elsewhere, an examiner first "test fires" the firearm and collects the expelled ammunition components. Then he or she uses a comparison microscope ("two microscopes [connected by an] optical bridge") to conduct a "side by side" comparison of the slugs and cartridge casings from the crime scene and the "test fires to see if [they share the] same unique detail[.]" Trained examiners thus determine if they can "match [a firearm] back to [previously] fired ammunition components[.]"

tion and Mulderig stated he was 100% certain about the match.

Defense counsel retained a firearms expert, who independently examined the same evidence. That expert did not testify at trial.

### B. The Request for a *Frye* Hearing

Just prior to trial, in January of 2008, appellant's counsel orally requested leave to adopt a motion which former co-defendant Leaks had filed in September of 2006 seeking a pretrial hearing on the admissibility of firearms identification evidence. Judge Dixon allowed the defense to adopt, summarize, and argue the motion. Appellant's counsel urged the court to conduct a *Frye* hearing,[2] asserting that pattern matching "is not generally accepted within the scientific community." Judge Dixon advised, "I'm familiar with that type of testimony, because we have heard it in other cases. What is the novelty of this issue[?]" Counsel argued that there is: a lack of "objective criteria by which a firearms examiner makes his conclusions"; "no peer review of their work"; "no proficiency testing"; and "no calculation of error rates[.]" By contrast, the prosecutor argued that pattern matching is the "generally accepted practice and, therefore, presumptively reliable." Judge Dixon agreed that the evidence was "an accepted type of analysis that has been admitted in courtroom after courtroom[,]" and he did not "find any need to conduct any type of

pretrial hearing on [its] admissibility[.]" Jones contends that the trial court erred in denying this request for a *Frye* hearing.[3]

### 1. The *Frye* Standard

■ In the District of Columbia, "before expert testimony about a new scientific principle [may] be admitted, the testing methodology must have become 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *Williams v. District of Columbia,* 558 A.2d 344, 346 (D.C.1989) (quoting *Frye,* 54 App.D.C. at 47, 293 F. at 1014). The "issue is consensus versus controversy over a particular technique, not its validity." *United States v. Jenkins,* 887 A.2d 1013, 1022 (D.C.2005) (citing *United States v. Porter,* 618 A.2d 629, 633 (D.C.1992)). Moreover, general acceptance does not require unanimous approval. *Porter,* 618 A.2d at 634. Once a "technique has gained such general acceptance, we will accept it as presumptively reliable and thus generally admissible into evidence. The party opposing the evidence, of course, may challenge the weight the jury ought to give it." *Jones v. United States,* 548 A.2d 35, 39 (D.C.1988). Although we do not doubt that a technique that has previously been recognized in court as generally accepted may lose that wide acceptance, we conclude that appellant has not shown that to be the case with respect to pattern matching as a way of identifying firearms.[4]

---

2. *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923).

3. Appellant also complains that the trial court denied the motion without having read it. Yet, Jones had not made Leaks's written motion physically available to Judge Dixon. Leaks had pleaded guilty in April of 2007, when the cases were assigned to Judge Satterfield. Leaks's 2006 motion was in his case jacket (not Jones's), and counsel conceded that he "didn't take the logistical step of seeking leave to join [Leaks's motion in writing]

or reproducing [it] and filing it in Mr. Jones' name." Moreover, counsel did not request that the court defer ruling until after it had read the motion or reconsider its merits after giving counsel additional time to provide a copy. In any event, we have read Leaks's motion, and nothing in it undermines the conclusions we explain below.

4. *See State v. Lucero,* 207 Ariz. 301, 85 P.3d 1059, 1062 (App.2004) ("To earn the right to a *Frye* hearing on previously accepted scientific evidence, the party opposing its admissibil-

## 2. Was a *Frye* Hearing Required?

 Here, the trial court properly admitted the expert testimony without conducting a *Frye* hearing. *Frye* only applies to "a novel scientific test or a unique controversial methodology or technique." *Drevenak v. Abendschein*, 773 A.2d 396, 418 (D.C.2001); *see Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 950–51 (D.C. 2003) ("*Frye* [ ] is inapplicable" and there is "no burden 'to demonstrate ... [that the cobalt test] has been generally accepted in the relevant scientific community'" because testimony of two investigators "highlights the fact that the MPD had used the cobalt test for many years" and nothing suggested it was "a novel test," or "new scientific technique," or "unique controversial methodology[.]") (quoting *Porter*, 618 A.2d at 633). Pattern matching is not new, and courts in this jurisdiction have long been admitting firearms identifications based on this method.[5] Even Leaks's motion conceded that "firearm and toolmark identification evidence has gener-

ally historically been accepted in various courts across the country." Indeed, Leaks (and appellant) cited no case that had excluded such evidence.

Appellant attempts to avoid this problem by asserting that, had the trial court conducted a *Frye* hearing, the defense could have demonstrated that the challenged method "was no longer generally accepted in the scientific community." This assertion is simply not true; comparison matching remains widely accepted and appellant misplaces his reliance upon a law review article[6] to suggest that pattern matching is no longer generally accepted within the relevant scientific community. Even the courts that have held pretrial hearings on the admissibility of firearms identification evidence, and considered the studies and articles cited by Jones on appeal (and Leaks below),[7] have not excluded this type of proof. Instead, the most these courts have done is to impose guidelines for the presentation of such evidence.[8]

---

ity must preliminarily demonstrate that the method is no longer accorded general scientific acceptance.") (internal quotation marks and citation omitted).

5. *See, e.g., Williams v. United States*, 881 A.2d 557, 566 (D.C.2005); *Peyton v. United States*, 709 A.2d 65, 66–67 n. 7 (D.C.1996); *Frendak v. United States*, 408 A.2d 364, 368 (D.C. 1979); *Frezzell v. United States*, 380 A.2d 1382, 1383 (D.C.1977); *see also Goodall v. United States*, 86 U.S.App.D.C. 148, 153, 180 F.2d 397, 402 (1950) ("evidence of such or similar [ballistics] tests or experiments is [generally] admissible in criminal cases in the federal courts") (citing cases); *Laney v. United States*, 54 App.D.C. 56, 60, 294 F. 412, 416 (1923) (upholding admissibility of "testimony given by the expert witnesses, tending to establish that the bullet, extracted from the head of the deceased, was shot from the pistol found in the defendant's possession").

6. Adina Schwartz, *A Systematic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 COLUM. SCI. & TECH. REV. 2 (2005).

7. Appellant urges us to consider recent reports of the National Research Council, Committee on Identifying the Needs of the Forensic Sciences Community, *Strengthening Forensic Science in the United States: A Path Forward* (2009), and the National Research Council, Committee to Assess the Feasibility, Accuracy and Technical Capability of a National Ballistics Database, *Ballistic Imaging* (2008), both of which were issued after the trial in this case. Although such evidence is not properly before us, even after considering it, we are still unpersuaded that pattern matching is no longer generally accepted.

8. *See, e.g., Commonwealth v. Pytou Heang*, 458 Mass. 827, 942 N.E.2d 927, 946 n. 31 (2011) (requiring examiner to testify "to a reasonable degree of ballistics certainty" but noting that Association of Firearm and Toolmark Examiners standards state that examiners should be conservative and not even testify as to a match unless, based on training and experience, they already consider it a "practical impossibility" that any other weapon could have been involved) (citing *Theory of*

In sum, nothing presented to the trial court (or to us) suggests that the pattern matching methodology is no longer generally accepted,[9] and there was no need for Judge Dixon to expend scarce judicial resources on a *Frye* hearing.[10] *See Jones,* 548 A.2d at 40, 42 ("General acceptance means just that; the answer cannot vary from case to case.... [So in evaluating general acceptance,] judicial notice of court

## C. The Experts' Expressions of Certainty

∎ Appellant asserts that the trial court should have at least precluded the experts from stating their conclusions with "absolute certainty excluding all other possible firearms." The government does not

---

*Identification as it Relates to Toolmarks,* 30 AFTE J. 86, 86–88 (1998)); *United States v. Willock,* 696 F.Supp.2d 536, 546–47, 571 (D.Md.2010) (pattern matching "generally accepted within the field of toolmark examiners"; adopting magistrate judge's recommendation that "in light of two recent [NRC] studies ... toolmark examiners must be restricted in the degree of certainty with which they express their opinions"); *United States v. Taylor,* 663 F.Supp.2d 1170, 1175–80 (D.N.M. 2009) (pattern matching "generally accepted among firearms examiners in the field"; given Schwartz's testimony and both NRC studies, examiners should state their conclusions "to within a reasonable degree of certainty in the firearms examination field"); *United States v. Diaz,* 2007 WL 485967, at *11, 14 (N.D.Cal. Feb. 12, 2007) (pattern matching "generally accepted by the firearms-examiner community"; in view of Schwartz's testimony, experts may state their opinions to a "reasonable degree of certainty in the ballistics field"); *United States v. Monteiro,* 407 F.Supp.2d 351, 372 (D.Mass.2006) ("[T]he community of toolmark examiners seems virtually united in their acceptance of the current technique"; considering, among other things, Schwartz's affidavit, an "examiner who has documented and had a second qualified examiner verify her results may testify ... that a cartridge case matches a particular firearm to a reasonable degree of ballistic certainty.").

9. *See Fleming v. State,* 194 Md.App. 76, 1 A.3d 572, 590 (2010) ("notwithstanding the current debate on the issue, courts have consistently found the traditional method [the comparative microscopic pattern matching technique] to be generally accepted within the scientific community"); *Commonwealth v. Meeks,* 2006 WL 2819423, at *29, 38–45, 50 (Mass.Super.Ct.2006) (examiners' testimony shows pattern matching is "generally accepted";

their testimony "overcomes Schwartz's challenge" because she has never "been trained as a firearms examiner or conducted a firearms examination," "conducted a test concerning the changes in toolmarks over time," "taken a proficiency test[,]" "watched the manufacture of a firearm, spoken with firearm manufacturers, or fired a gun").

10. *See Pytou Heang,* 942 N.E.2d at 943 (even in light of recent studies, no error in denying request for *Daubert* hearing because testimony based on comparison matching "has long been deemed admissible" and a *Daubert* hearing is "generally not required where we have previously admitted expert testimony of the same type," "for the same purpose," and where there is no issue as to "whether the expert is qualified," or "the appropriate methodology has been followed"); *United States v. Cerna,* 2010 WL 3448528, at *4–6 (N.D.Cal. Sept.1, 2010) ("no need for a pretrial *Daubert* hearing" because the *Diaz* order found pattern matching "passed *Daubert* muster"—meaning, among other things, it is "generally accepted by the firearms community"—and "[d]evelopments subsequent to the *Diaz* ruling, [like the Path Forward Report] have not undermined" it; court's "gatekeeping role is not intended to serve as a replacement for the adversary system") (internal quotation marks and citations omitted); *Commonwealth v. Whitacre,* 878 A.2d 96, 101 (Pa.Super.Ct.2005) (pattern matching "generally accepted by the scientific community consisting of firearms experts and by a number of significant governmental bodies"; since it "has been in use since the 1930's, it is neither new nor original, but rather is [] offered all the time") (citing *Commonwealth v. Dengler,* 843 A.2d 1241, 1243–45 (Pa.Super.Ct.2004) ("a *Frye* analysis is not triggered every time science enters the courtroom; it only applies when an expert seeks to introduce novel scientific evidence")).

directly concede the point, but instead represents that the current policy of the United States Attorney's Office "is to have firearms experts qualify their conclusions 'to a reasonable degree of scientific certainty[.]'" In light of the government's representation and the growing consensus that firearms examiners should testify only to a reasonable degree of certainty, see note 8, *supra*, we will assume, without deciding, that such experts should not be permitted to testify that they are 100% certain of a match, to the exclusion of all other firearms. Nevertheless, we agree with the government that any such error was harmless in this case. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[11]

Defense counsel thoroughly cross-examined the experts about three topics: their level of certainty; the subjective nature of their conclusions; and the lack of demonstrative evidence from which the jurors could assess their conclusions. Counsel pointed out, for example, that Morin was willing to "conclude that a cartridge casing is matched to a particular gun to the exclusion of all other possible guns," even though he had not examined all those other firearms. Defense counsel emphasized that Mulderig had rendered an "opinion of 100% certainty that [two casings were] fired from the same weapon[,]" although he acknowledged there were inconsistencies between them. Counsel also questioned Mulderig about how he could "tell with certainty" that various marks were "imparted to the case head by the gun" instead of during the manufacturing process.

Mulderig agreed that his conclusions were "all subjective [based] on what you see in the microscope" and concurred with defense counsel's assertion that "none of you [examiners] are scientists[.]" In a similar manner, Morin conceded that "the concept of sufficient agreement is purely a subjective one[.]" Morin agreed with the defense's observation that, in the firearms identification "field, there's no universal agreement as to how many features of similarity constitutes sufficient agreement[.]" Defense counsel also asked, "[W]hat is there about this science that the average juror could look at to determine whether or not your conclusions are accurate?" When Morin suggested "that the jurors go back to [his] microscope, [where he] would show them" the matching patterns, defense counsel pointed out that Morin "didn't bring [his] microscope" to court.

In his closing argument, Jones's counsel used the examiners' expressions of certainty to his advantage. Counsel asserted that, in light of the "completely and totally subjective" nature of examiners' conclusions and the fact that neither examiner provided the jury with a visual depiction of the "points of comparison where they found similarities[,]" "all [the jury] got" from the experts was a "trust me, this is the answer." The defense suggested that, as a result, when the experts said, "I'm sure[, there's a match, h]undred percent[, t]ake it or leave it[,]" the jury should "leave it."

In the face of this record, the jury's assessment of this evidence surely did not

11. Although appellant's claim regarding expressions of certainty was arguably preserved in Leaks's written motion, see note 3, *supra*, Jones's attorney never brought the issue "to the judge's attention, nor did [ ] counsel ever renew the motion on the basis of any specific prejudice occurring during the trial." *Thorne v. United States*, 582 A.2d 964, 965 (D.C.1990) ("A party who neglects to seek a ruling on his motion fails to preserve the issue for appeal."). Nevertheless, the government has not asked us to apply plain error review, so we will assume that the point has been preserved for appeal.

turn on the difference between a "100% certain" conclusion and a "reasonably certain" opinion. Defense counsel did not present an expert to explain the difference or to opine that the government examiners' confidence in their results was unjustifiably exaggerated. Nor did the defense put on an expert to point out any weaknesses in the methodology employed by the government experts. In fact, even though the trial court made it possible for the defense to conduct an independent test, it chose not to have an expert testify at all. *See Roberts v. United States*, 916 A.2d 922, 931 (D.C.2007) ("[W]hile '[n]o amount of attention to detail, auditing, and proficiency testing can completely eliminate the risk of error[,] ... the best protection an innocent suspect has from a false match is an independent test[.]'") (quoting National Research Council, The Evaluation of Forensic DNA Evidence (1996)).

In sum, reversal is not warranted when the record is considered as a whole. An eyewitness to the murder identified appellant, who gave a detailed confession to a cellmate. Even if the government's experts had qualified their conclusions "to a reasonable degree of scientific certainty," the strength of the government's case would not have been appreciably diminished. In these circumstances, "we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Goines v. United States*, 905 A.2d 795, 802 (D.C.2006) (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239).

### D. Excluding a Photograph

When discussing the pattern matching process on cross-examination, Morin ex-

plained that experts "are looking for *quality and quantity* of detail that matches," [that is,] "striated detail, which are lines, or [ ] impressed type detail, pot mark type detail, [or] circular detail." Morin then described his laboratory's policy "not to take photographs of our examinations[,]" due to the fact "that photographs are two-dimensional representations of what we are looking at, which is generally three-dimensional." Under a microscope, experts can determine the depth and width of impressed details, which is "not easily reproduced in a photograph." According to Morin, "based on [ ] training and experience," experts are also able to "filter out some of the extraneous detail that is necessarily left by [ ] residue in the barrel[.]" For those reasons, "[a] photograph may lead somebody who is not trained in the examination of firearms to the wrong conclusion."

By contrast, Mulderig had taken a photograph through his comparison microscope and defense counsel used it to question him about his exam techniques and conclusions. First, the defense got him to agree that, although "there's a pattern of striation marks[ ] on the primer, which you have determined to be consistent on both casings, ... [t]here are also marks on both the primer and the case head which do not appear to be consistent, right?" After Mulderig described the picture,[12] defense counsel questioned him about several specific differences between the two images depicted there. For example, counsel asked: "Now on the silver one it would appear that there's a firing pin impression on the very center of the primer? ... And there's a similar crater-looking firing pin impression on the gold sample—evi-

---

**12.** Mulderig agreed that "there's two samples [in the] photograph, ... one on the left [that] is gold, ... [and] one on the right [that] is silver[.] ... And the silver one is the test fired cartridge[.] ... And the gold one is the piece of evidence from the crime scene[.]"

dence sample, but it's to the right of the center of the primer, ... at about 3 o'clock?" Defense counsel questioned Mulderig about another mark at "9 o'clock, or maybe at 9:30," on the gold sample which did not appear "at the same position on the silver shell casing[.]" The defense also inquired whether Mulderig agreed that "at 12 o'clock, on the base head of the gold cartridge case there's a remarkable blemish ... [and] there is no similar remarkable image at the same 12 o'clock position on the silver case head?"

Although Mulderig readily conceded these apparent differences in the markings on the two casings as depicted in the photo, he also explained that "a trained examiner doesn't come to any conclusions by looking at pictures. You have to look at the evidence." He emphasized that, just because "[i]n the photo there is not" a similar mark on the two casings, that "doesn't mean it wasn't there under the microscope.... I'm looking at a microscope with very, very expensive equipment, called lenses, and a camera may not capture everything[.]" So when conducting an examination, he testified, "I don't rely on the photographs; I'm relying on my eyes, and my microscope[.]"

Subsequently, at a bench conference held so as not to put defense counsel "on the spot in front of the jury," the trial court "confirm[ed that counsel was] not at a point to move th[e] exhibit into evidence." Defense counsel agreed, but said, "I do intend to move it into evidence." The prosecutor then noted that he planned to object, given the experts' testimony that a picture does not fairly and accurately capture everything an examiner sees under a microscope. The prosecutor mentioned this in advance, he explained, because Mulderig would not be available after the prosecution rested, and "so that [the defense] wouldn't be trying to [admit

it] in the absence of a witness in the defense case." Defense counsel responded: "That's fair. And I appreciate it. I'll try and lay the foundation for it right now."

Counsel then asked Mulderig: "[G]iven th[e] caveat" that "you testified [about] previously that it may not depict certain marks that you can see with your eyes in the microscope [because] the camera hasn't picked [them] up," is the photograph a "fair and accurate depiction of what you looked at through the microscope?" Mulderig answered: "For the most part, yes." At no point during Mulderig's testimony did defense counsel seek to admit the photograph into evidence.

Later, Judge Dixon expressed the "tentative view [ ] that based on the witness's testimony" to that point, he would not admit the photograph because it "would be more confusing than it is probative." Instead, the defense would "need some sort of expert testimony that the photograph" was actually "demonstrable of either the lack of a comparison, or of the comparison." The court gave such notice "just so that if you need to make arrangements with your expert you can do so." Counsel responded: "We do intend to do that, Your Honor." Yet, despite having retained a firearms expert who had looked at the photograph, conducted an independent test-fire, and examined the evidence, the defense did not present testimony from him or any other expert.

When the defense sought to introduce the picture into evidence at the end of its case, Judge Dixon excluded it, "having viewed the photograph with respect to what the defense contends may be differences that the [ ] expert should have taken into con[sidera]tion, and based on the expert's testimony ... that no expert would use that type of photograph to make an

analysis[,] and in the absence of any contrary evidence...."

### 1. Standard of Review

■ "The admission of photographs is 'within the sound discretion of the trial judge.'" *Henderson v. United States*, 527 A.2d 1262, 1264 (D.C.1987) (quoting *Rich v. District of Columbia*, 410 A.2d 528, 531 (D.C.1979)). This is because "the trial judge [ ] is in the best position to determine [the photograph's] relevance and accuracy." *Simms v. Dixon*, 291 A.2d 184, 186 (D.C.1972); *see also March v. United States*, 362 A.2d 691, 704 (D.C.1976) ("the trial judge ... is in the best position to determine whether [the photographs] properly reflect the testimony or the circumstances sought to be depicted") (brackets in original; internal quotation marks and citation omitted).

### 2. Analysis

■ The test of admissibility "is whether the photograph[ ] accurately represent[s] the facts allegedly portrayed by [it]." *Henderson*, 527 A.2d at 1264 (quoting *Simms*, 291 A.2d at 186). Jones's attorney reasoned that Mulderig "explained why the[ differences] don't change his opinion about the identification, but it is relevant evidence, and the jury should be allowed to understand what he's talking about." However, both experts testified that such two-dimensional depictions of what examiners observe three-dimensionally under a microscope do not accurately represent the "physical differences" in the markings on the casings. According to both experts, photographs can be misleading. Because of its inherent deficiencies, Mulderig never unequivocally stated that the photograph was a "fair and accurate depiction" of what an examiner would see through a microscope.

■ "Discretion signifies choice." *(James) Johnson, v. United States*, 398 A.2d 354, 361 (D.C.1979). We do "not render [our] own decision of what judgment is most wise under the circumstances presented," but instead recognize that "the decision-maker exercising discretion has the ability to choose from a range of permissible conclusions." *Id.* at 361–62. Although another judge might have admitted the photograph, perhaps with a cautionary instruction, Judge Dixon did not act outside the range of permissible conclusions by excluding it.

■ Moreover, we are not convinced that seeing the photograph would have affected the jury's verdict. *See id.* at 367 (a trial court has not abused its discretion unless "the exercise of discretion was in error *and* ... the impact of that error requires reversal") (emphasis added). Testimony that the photograph depicted several readily observable differences in the casings was certainly before the jury. Moreover, defense counsel extensively and effectively cross-examined Mulderig about those dissimilar markings and made the jurors well aware that Mulderig had not provided them with a visual means to evaluate his conclusion. Regardless of whether Judge Dixon erred in excluding the picture, doing so did not cause Jones any "significant prejudice," *Stone v. Alexander*, 6 A.3d 847, 851 (D.C.2010) (internal citation and quotation marks omitted), and reversal is not warranted.

### III. "Other Crimes" Evidence

### A. Applicable Legal Principles

■ "It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew v. United States*, 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964)

(emphasis in original). "Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes *unless* that evidence can be admitted for some substantial, legitimate purpose." *Id.* at 15–16, 331 F.2d at 89–90 (footnotes omitted; emphasis added). Importantly, "the presumption of prejudice that attends other crimes evidence" does not apply if (1) the evidence is "offered for a substantial, legitimate purpose"; (2) the government demonstrates by clear and convincing evidence that the defendant committed the other crime; and (3) the legitimate probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Johnson v. United States,* 683 A.2d 1087, 1092–93 (D.C.1996) (en banc).

■■■■■ Valid, non-propensity purposes "includ[e], but [are] not limited to[,]" proof of identity, motive, intent, absence of mistake or accident, and common scheme or plan. *Johnson,* 683 A.2d at 1092. Moreover, the "*Drew* strictures" do not apply where evidence "(1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Id.* at 1098. We review the trial court's decision to admit evidence, including evidence of other crimes, for an abuse of discretion. *Nellson v. United States,* 989 A.2d 1122, 1126 (D.C.2010) (citing *Artis v. United States,* 505 A.2d 52, 56 (D.C. 1986)).

### B. Procedural Background

As explained above, firearms examiners determined that the .45–caliber pistol used in the Check Into Cash robbery in North Carolina (and later recovered from Ward's North Carolina apartment) had been used to murder Valentine in the District of Co-

lumbia. Testing also established that the 9–millimeter pistol recovered from Ward's apartment was the same 9–millimeter pistol used in the North Carolina robbery. Police also discovered, and store manager Geil identified, clothing that the robbers discarded behind the store. From that clothing, forensic analysts recovered DNA profiles matching Jones and Leaks.

Before trial, appellant and Leaks filed a motion to exclude evidence related to the North Carolina robbery. The government opposed the motion and, at a pretrial status hearing before Judge Satterfield, sought permission to show a two-minute surveillance video of the robbery and to introduce "the guns, the clothing, shell casings, bullets, as well as testimony from the [shooting] victim[.]" It argued that the North Carolina evidence was *Drew* identity evidence and would also "corroborate a key Government witness" (Hines) who heard "confessions by Ricardo Jones" to both crimes. According to the prosecutor, the forensic evidence from the Check Into Cash scene was also "direct proof" (*Johnson* evidence) that appellant shot Valentine.

Judge Satterfield agreed that the North Carolina evidence was admissible under *Johnson* and *Drew.* Consequently, he explained, "all I'm looking at right now is trying to sanitize the prejudicial impact, because I think it clearly has probative value." The court first sought to minimize the prejudice by precluding the guard from testifying, so "the jurors [would not] see the [victim] and what that person went through by getting shot[.]" At the court's urging, the government proposed other ways of sanitizing the evidence, and the parties had lengthy discussions about possible stipulations that would affect the court's balancing of probative value and prejudicial impact. Because the defense concentrated on persuading the court to

change its mind and entirely exclude evidence of the robbery, most of these discussions were fruitless.

Recognizing that the ballistics evidence would otherwise have little meaning, Judge Satterfield was inclined to let the government "establish that a gun was fired ... during the course of this robbery ... without establishing though that somebody was shot." Nevertheless, the court's tentative tone and its numerous requests for the defense to agree to one of the government's proposed means of sanitization demonstrated that it had made no final decision on whether the government could establish that the guard was shot.[13]

On April 3, 2007, Leaks pleaded guilty and on December 31, 2007, the case was transferred to Judge Dixon, who read the transcripts related to Judge Satterfield's ruling and discussed the "other crimes" issue with counsel at length. During one such discussion, defense counsel said he planned to "vigorously dispute" identification, including the DNA evidence.[14] "They can prove that the gun was used at both places, but they really are not going to be able to prove that it was Mr. Jones who was in both places ... using that gun." In

a subsequent colloquy, the defense added that it would attack Hines's credibility.[15]

The government explained that the prejudicial impact of the evidence from North Carolina had already been significantly limited by the decision that the guard could not testify. It was important to admit details like the robbers shooting the guard and taking his .38–caliber pistol to corroborate both Jones's confession and Hines's testimony. The prosecutor emphasized that Hines's testimony was "already going to be significantly sanitized" because Jones had been charged in another assault with intent to kill case and had told Hines details about that crime as well, and the prosecutor had already instructed Hines not to discuss that matter. Therefore, "if we have got this witness who is not the most sophisticated person in the world, tip-toeing these off-limits issues[,] it is not fair to his presentation and demeanor."

Judge Dixon recognized the importance of the jailhouse statement in which appellant said that he shot someone in both locations, had used the .45–caliber pistol on both occasions, and had stolen the guard's .38–caliber pistol. The court also knew that the defense planned to blame the

---

**13.** We therefore reject appellant's argument that Judge Satterfield had established the "law of the case" with respect to this question. *See Kritsidimas v. Sheskin,* 411 A.2d 370, 372 (D.C.1980) (the law of the case doctrine "does not apply where the first ruling has little or no 'finality' to it").

**14.** More than one individual's DNA was present on the item of clothing (a black nylon used as a mask), which had Jones's DNA on it. The "predominant profile" at all sixteen genome locations tested (the "larger concentration" of DNA overall) matched Jones's DNA profile. Leaks could not be ruled out as the minor contributor to the DNA mixture. For that reason, defense counsel argued: "The DNA evidence doesn't put Mr. Jones on the scene either. It's no different than me

stealing [the prosecutor's] necktie," "committing a robbery with [it on,]" "leaving it on the scene[,]" and then "asking the jury to belie[ve,] 'well, [the prosecutor] obviously did this robbery because his DNA was found on the clothing.'" The defense used the exact same analogy in its closing and made a similar argument in its opening statement.

**15.** Counsel claimed, "there is as much connection to the .45 between Mr. Leaks [ ] as there is to Mr. Jones.... You obviously can't give high credit to the statements made by the jailhouse informant"; "the credibility of his statement is going to be suspect ... [because] it is just as likely that he got all this information from Mr. Leaks and [ ] is now attribut[ing it] to Mr. Jones in the interest of getting out of jail."

North Carolina robbery and shooting on Mr. Leaks. Balancing the probative value of the evidence against its prejudicial effect, Judge Dixon ruled that the government could say there "was a nonfatal shooting" in North Carolina. He could not "see trying to sanitize both the North Carolina incident and the jailhouse statement without doing terrific prejudice to the evidence. I find that the probative value far outweighs the prejudice, because the whole purpose of the evidence is to prove [ ] identity[.]" Thereafter, Judge Dixon permitted store manager Geil to explain that the guard was shot and to narrate the surveillance video as it played.

### C. Analysis

 To begin, we recognize that even when other crimes evidence is admitted for a valid purpose, it may be used in an improper manner. Nevertheless, we have found no instances in this record where the prosecutor either "explicitly or implicitly suggested … that the other crimes evidence evinced a predisposition to commit the charged crime." *Johnson*, 683 A.2d at 1093. To the contrary. Referring to the robbery in closing, the government asked rhetorically: "Why did you hear about [this?] Because it's powerful evidence of identification."

Indeed it was. Evidence of the robbery undoubtedly was relevant to prove that Jones murdered Valentine. Although the murder weapon was not found in the District of Columbia, the police did recover a .45–caliber shell casing and a copper-jacketed bullet from the murder scene. That same pistol was used at the Check Into Cash robbery, and DNA evidence tied appellant Jones to that event. Moreover, Jones had stayed at the North Carolina home from which that pistol was recovered. *See id.* (approving admission under *Drew* identity exception of evidence that double homicide was committed with same gun used in murder at issue).

Identity was a hotly contested issue. Without the North Carolina evidence, the defense would have had freer rein to argue that Davis's identification of Jones was unreliable and uncorroborated. According to Davis, his neighbor Leaks did not shoot Valentine—the shorter man with the medium build beside him did. Geil's testimony about the robbery, the surveillance video, and the DNA evidence all were relevant to prove the identity of the shooter in the Valentine murder because they helped answer the question: Who was the shorter, heavier man with Leaks on Meigs Place?

Geil testified that the robbers carried a black bag (which appeared similar to the bag containing ammunition Ward found in her home), and that the taller of the two men wore a "stretchy, knit hat[ ]" and "dark blue work shirt[,]" while the "short, stockier one [wore] a lighter blue" work shirt. The black and white video also showed the bag, the clothing worn by the two robbers, and their relative sizes.[16] DNA evidence established that Jones and Leaks were the robbers and that the robber in the dark knit hat and dark blue shirt was Leaks.[17] Collectively, this evi-

---

16. The video showed two men walking into the store, firing, and collecting money. The guard's back was visible in the corner of the video frame prior to the robbery and then he dropped completely out of view after the men entered the store shooting. There was no gory portrayal of the shooting or its effect on the guard.

17. The predominant DNA profile obtained from a black nylon cloth used as a mask matched Jones's DNA profile; Leaks could not "be excluded as a contributor in the weaker profile" on that cloth. Leaks matched a partial profile developed from a brown knit hat and could not be excluded as a contributor to a DNA mixture profile developed from the dark blue shirt.

dence tended to prove that Jones was the shorter, stockier robber. And when considered along with the evidence that Jones and Leaks fled Meigs Place together and stayed together in North Carolina, it also made it more likely that Jones was the shorter, stockier shooter with Leaks on Meigs Place.

The North Carolina evidence had probative value not only as independent evidence of identity, but also because it corroborated other identity evidence. *See Minick v. United States,* 506 A.2d 1115, 1119 (D.C.1986) (parole papers and testimony concerning the papers admissible as evidence of appellant's identity; although parole papers implied the existence of a prior criminal record, "[t]he witnesses' specific reference to a detail like the parole papers added 'narrative veracity' to their testimony and reinforced their credibility to recall the events of the evening in question."); *cf. Strozier v. United States,* 991 A.2d 778, 784 (D.C.2010) ("Concerning probative value, the pictures may be admitted 'so long as they were in some way relevant, either independently or as corroborative of other evidence.'") (quoting *Pittman v. United States,* 375 A.2d 16, 19 (D.C. 1977)). In particular, this evidence powerfully corroborated Jones's confession to Hines. Many courts have recognized that, while corroboration is not a classic example of a non-propensity purpose,[18] "evidence of other crimes or acts is admissible to corroborate evidence that itself has a legitimate non-propensity purpose." *United States v. Bowie,* 344 U.S.App.D.C. 34, 44, 232 F.3d 923, 933 (2000) (collecting cases); *see also United States v. Bailey,* 355 U.S.App.D.C. 64, 70, 319 F.3d 514, 520 (2003) ("[Other crimes] evidence might corroborate a witness's testimony by showing plan, purpose, intent, etc. and therefore be admissible[.]").

In his confession to Hines, appellant described his role in both shootings. *See Bowie,* 344 U.S.App.D.C. at 44, 232 F.3d at 933 ("[Prior crimes evidence often has] 'multiple utility.' ... It not only tended to establish Bowie's intent and knowledge, but also corroborated Bowie's confession to the Secret Service."). The fact that the North Carolina evidence corroborated the details of Jones's confession to his participation in the robbery suggests that Jones spoke with candor about his role in the murder as well.[19] For example, Jones told Hines that .45–caliber and 9–millimeter pistols were used in the robbery (they were); that a security guard was shot (he was); and that they stole the guard's .38–caliber pistol (they did).

The forensic evidence from the North Carolina robbery also was admissible as direct evidence of the Valentine murder because it helped to demonstrate that appellant possessed the murder weapon. *See, e.g., Busey v. United States,* 747 A.2d 1153, 1165 (D.C.2000) ("[T]estimony that uncharged act corroborated defendant's confession to both acts) (citing *United States v. Wimberly,* 60 F.3d 281, 284–85 (7th Cir.1995) (in sexual molestation prosecution, court admitted defendant's confession to molesting another stepdaughter thirteen years earlier to bolster credibility of his confession to charged crime (both confessions were made to the same therapist); although defendant claimed he had falsely confessed to molesting recent victim, he had no reason "to fabricate a story concerning a totally unrelated incident")).

---

**18.** *Drew* did not include "corroboration" in its list of permissible uses for "other crimes" evidence, but it explicitly stated that its list of valid, non-propensity purposes was non-exhaustive. *Drew,* 118 U.S.App.D.C. at 16 n. 10, 331 F.2d at 90 n. 10; *see Johnson,* 683 A.2d at 1092.

**19.** *See, e.g., Bowie,* 344 U.S.App.D.C. at 44, 232 F.3d at 933 (in prosecution for possession of counterfeit currency, approving introduction of uncharged act of possession one month before charged crime, where proof of

[appellant] possessed a revolver that might have been the murder weapon was not admitted improperly to establish criminal propensity. That evidence was directly relevant, and was not *Drew* evidence, because it constituted evidence supporting the charge that [appellant] was the person who [committed the charged crimes].")." In this case, the trail of forensic evidence traveled from the Valentine murder scene, to the check cashing store, to Ward's residence. By leaving DNA and ballistics evidence at the robbery scene, and subsequently stashing the .45–caliber pistol at Ward's apartment, appellant made evidence of the robbery part of the "direct and substantial proof" that he possessed the murder weapon.

The defense's closing argument reinforces the importance of the direct and corroborating evidence from North Carolina. Counsel began by talking about Davis's identification of appellant and claimed, "[t]his is a one-witness case." In addition to attacking Hines's credibility, the defense asserted in turn that Davis "lied to you[,]" Ward "is not being completely honest with you[,]" and Geil was "mistaken." Jones's attorney ultimately suggested, "there's not a witness in existence that puts that .45 in [ ] Jones' hands in any time, at any place.... [Yet,] every time that gun is used, you know for a fact Joseph Leaks is there."

■ The final step in a *Drew* or *Johnson* analysis is evaluating whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Johnson,* 683 A.2d at 1099; *Busey,* 747 A.2d at 1165. " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999) (citing *Old Chief v. United States,* 519 U.S.

172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).

■ We recognize (as did the trial court) that admitting evidence of an uncharged armed robbery will have a prejudicial impact (especially if the robbery includes a shooting). But there was no unfair prejudice in this case because the evidence was admitted for a valid purpose. Moreover, the trial court diligently "control[led] the development and use of the evidence at trial." *Johnson,* 683 A.2d at 1101. Judge Satterfield precluded the government from putting the guard on the stand. (In addition, the prosecutor elicited from Geil that the security guard had survived.) Judge Dixon engaged in several colloquies with counsel throughout trial about how to limit the evidence appropriately.

Further limiting the danger of misuse, the trial court gave detailed instructions during the testimony about the North Carolina robbery and during its final charge. Judge Dixon made it clear that the "evidence is only being put forth to you for th[e] purpose of identity[,]" and that the jury was "not to consider this evidence [ ] as to whether or not the defendant is of bad character" or "has a criminal personality." During his final instructions, he cautioned, "if you find that the defendant participated in the North Carolina offenses, consider that evidence only for the limited purpose of deciding whether the Government has proved beyond a reasonable doubt the identity of the defendant as the person who committed the murder ... [and you] may not consider the evidence [ ] for any other purpose.... [Y]ou may not [use it] to conclude that the defendant has a bad character or [ ] a criminal personality."

Judge Ruiz asserts that the government had enough evidence linking appellant to the .45 caliber handgun without admitting

the video, details of the robbery, or the fact that the guard was shot. However, the discovery of the gun in Ward's apartment could be, and was, used to point the finger of blame at Leaks. Without corroboration, Hines's testimony would have been even more vulnerable to the attacks upon his credibility launched by Jones's counsel. And without proof of how the robbery took place (including that there were two gunmen of different sizes), the jury might have found more persuasive counsel's argument that the DNA evidence on the clothes failed to link appellant to the robbery and the gun.

As we recognized in *Johnson*, "in applying the reasonable doubt standard, [juries] may demand a showing of a very high probability of guilt, especially when one is accused of first-degree murder." 683 A.2d at 1095 ("the murder of two innocent boys" committed with same weapon used in charged murder was "worse than deplorable," but it was unlikely that the jury would reach "conclusions about [appellant's] proclivity for violence before it was satisfied that he was guilty of the charged crime"); *see also Old Chief*, 519 U.S. at 189, 117 S.Ct. 644 (a jury that hears "a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard"). Here, for good reason, the jury was allowed to hear evidence linking appellant to the murder on trial.

 In sum, this was relevant evidence admissible under both *Drew* and *Johnson*. The critical issue was determining whether its probative value was substantially outweighed by the danger of unfair prejudice. " '[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.' " *Mercer*, 724 A.2d at 1185 (quoting *Johnson*, 683 A.2d at 1095). The trial court performed a careful and conscientious balancing here, and we find no abuse of discretion.

## IV. Bias Cross–Examination

Jones complains that the trial court foreclosed presentation of a defense theory that the police investigation was biased by a past relationship between Detective A, who assisted in the Valentine murder investigation, and the older brother of former co-defendant Leaks. He also asserts that the court impermissibly limited bias cross-examination of Tom Saunders, a former detective from Reidsville, North Carolina. We are not persuaded by either claim.

### A. Legal Principles

 Although a "trial court's refusal to allow any questioning tending to elicit evidence of bias" denies a defendant his Sixth Amendment right to confront witnesses against him, *Elliott v. United States*, 633 A.2d 27, 32 (D.C.1993), it is well-established that this right "is not unlimited." *Coles v. United States*, 808 A.2d 485, 489 (D.C.2002). Importantly, "a proper foundation must be laid" prior to pursuing "a line of questioning suggesting that a witness is biased." *Ray v. United States*, 620 A.2d 860, 862 (D.C.1993). An adequate foundational "proffer is necessary to establish the relevance of a proposed inquiry by facts from which the trial court may surmise that the line of questioning is [in fact] probative of bias." *Melendez v. United States*, 10 A.3d 147, 152 (D.C.2010).

### B. Detective A

Prior to trial, the government disclosed that more than two decades previously,

when she was a teenager, Detective A had had a relationship with Leaks's older brother, who was now dead. Although the defense was allowed to use this information in its investigation, the trial court cautioned that counsel could not refer to the matter "in open court" without prior approval. Neither Detective A nor Leaks testified at trial, so their credibility was not at issue.

Only once during trial did the defense attempt to show that favoritism had affected the investigation. During the testimony of the lead detective, defense counsel in essence asked why he had not arrested Leaks sooner. At the bench, counsel explained that he was "trying to develop the favoritism of the police investigation towards Mr. Leaks and against Mr. Jones." He contended that the police "had plenty to get a warrant for ADW gun back in July, but because Detective [A] is involved in this case, [the detectives] chose not to[.]"

 Judge Dixon did not abuse his discretion by precluding questioning about A's long-past relationship with Leaks's older brother. In the first place, the defense did not demonstrate how the timing of Leaks's arrest was relevant to Jones's guilt or innocence. *See McCraney v. United States*, 983 A.2d 1041, 1054 (D.C.2009) ("A defendant 'has no right to present irrelevant evidence.' "). Moreover, the lead detective testified that he had in fact applied for a warrant prior to Leaks's actual arrest, and the resulting proffers established that any delay in arrest was attributable to the prosecutor, not the police. Finally, it is entirely speculative to suggest that the relationship revealed to defense counsel would have biased the police investigation against appellant Jones.[20]

The record belies any argument that the decision to charge Jones as the shooter and Leaks as an accessory is evidence of police bias. Before the lead detective or Detective A arrived on the murder scene, Davis had already told other detectives that the person he recognized from his neighborhood (Leaks) was not the actual shooter. When Davis identified Leaks during the subsequent photo identification procedure, Davis said Leaks was not "the person who actually did the shooting[,]" but the one who "pointed a firearm at [me] and Mr. Valentine initially[,] and then apologized for having done so, prior to the shooting." In light of this record, the defense did not meet its "obligation to establish a prima facie basis for the alleged bias[,]" *Melendez*, 10 A.3d at 153, and the trial court did not abuse its discretion.

### C. Mr. Saunders

Tom Saunders photographed and took custody of the firearms Amanda Ward had discovered in her spare bedroom. At trial, the prosecution elicited that Saunders' police department asked him to resign after an administrative investigation into allegations of sexual harassment that he initially denied but later acknowledged. (This happened approximately two years after he collected the evidence.) On cross-examination, Saunders reiterated that he falsely denied the allegations when first confronted with them and stated that he had submitted job applications to two police departments.

Appellant claims that the trial court erred by precluding the defense "from bringing out the nature of the underlying conduct, even though it was criminal and

---

**20.** Jones points out that there was a related *ex parte* proffer (maintained under seal) that "appellate counsel [still] does not know" about. We have examined that material, and it reveals no valid basis for cross-examination.

had not been prosecuted." Notably, Judge Dixon stated that he would allow the defense to ask whether Saunders was charged with a criminal offense as a result of the sexual harassment (he was not), but counsel did not ask the question.

■■■■ The details of a prior bad act ordinarily are irrelevant unless they " 'bear[ ] directly upon the veracity of the witness in respect to the issues involved [in] the trial.' " *Grayton v. United States*, 745 A.2d 274, 280 (D.C.2000) (quoting *Sherer v. United States*, 470 A.2d 732, 737–38 (D.C.1983)); *see Murphy v. Bonanno*, 663 A.2d 505, 508–09 (D.C.1995) (same). Here, the details of Saunders' conduct did not bear directly on his veracity, and Jones's attorney had much more powerful ammunition available to impeach his credibility—Saunders had admitted that he lied when accused of job-related misconduct. Moreover, Saunders hoped to be a police officer once again and perhaps believed, rightly or wrongly, that currying favor with the prosecution in this case would enhance his job prospects. Under these circumstances, there was no error, let alone reversible error, in limiting cross-examination.

### V. Other Claims of Error

■■■ The trial court declined to strike for cause a prospective juror who was an attorney in the Homicide Section of the United States Attorney's Office. "In this case, however, we need not decide whether the judge abused [his] discretion because [the] prospective juror[ ] whom appellant sought to strike for cause [did not] end[ ] up on the jury that actually heard the case"—defense counsel removed her "by peremptory challenge[.]" *Johnson v. United States*, 804 A.2d 297, 304 (D.C. 2002) (citing *United States v. Martinez–Salazar*, 528 U.S. 304, 317, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) ("[A] defendant's

exercise of peremptory challenges ... is not denied or impaired when [he] chooses to use a peremptory challenge to remove a juror who should have been excused for cause[.]")); *see also Ahmed v. United States*, 856 A.2d 560, 563–64 (D.C.2004).

■■■ Jones also asserts that the trial court erred in denying his motion to suppress Davis's identifications of him as the shooter. We agree with the trial court's decision, "both for reasons that the identification is reliable and because there was nothing about the array that was suggestive in terms of the description and information given by the witness, Mr. Davis[.]" *See Jones v. United States*, 879 A.2d 970, 975 (D.C.2005) (quoting *Smith v. United States*, 777 A.2d 801, 805 (D.C.2001)).

While the photo array may have been less than ideal because two of the photos appeared darker than the others, it was in no way impermissibly suggestive. *See Buergas v. United States*, 686 A.2d 556, 558 (D.C.1996). In any event, Davis's identification was clearly reliable and thus properly admitted into evidence. *See Black v. United States*, 755 A.2d 1005, 1008 (D.C.2000) (articulating five factors to consider). Davis paid close attention to, and had an unobstructed view of, appellant's face while he neared appellant and Leaks and ultimately stood just an "arm's reach away" from them. Beyond those objective indicia of reliability, Davis repeatedly stated he would "never forget" the shooter's face and knew he "picked out the right person who shot my man[.]"

Finally, appellant claims that the trial court was obliged to grant his last-minute motion for a continuance so his attorney could locate Tamika Queen, a potential alibi witness. Counsel had relied upon appellant's family members to contact Queen, but she did not come to court that morning, the day that evidence closed. Counsel acknowledged that Gerald Kelly,

who was present at trial, "can testify to the—the essence of the alibi...." In fact, Kelly did so.

■ Given the "wide latitude" granted to trial courts in such matters, *Moctar v. United States,* 718 A.2d 1063, 1065 (D.C. 1998), we discern no abuse of discretion. Although counsel had announced at the outset of trial that Queen was a potential defense witness, he had not served her with a subpoena, despite a week-long midtrial break. *See Price v. United States,* 545 A.2d 1219, 1228 (D.C.1988) (no abuse of discretion in denying continuance where, among other factors, defense had not subpoenaed the witness); *Moctar,* 718 A.2d at 1066 (same). Moreover, Queen's testimony would have been cumulative of Kelly's, and several other people supposedly had attended the birthday party which served as an alibi. Thus, appellant has not shown that the continuance was "reasonably necessary for a just determination of the cause." *Bedney v. United States,* 684 A.2d 759, 766 (D.C.1996) (internal quotation marks and citation omitted).

For the reasons discussed, the judgments of conviction are

*Affirmed.*

FARRELL, Senior Judge, with whom Judge FISHER joins, concurring:

I join Judge Fisher's opinion entirely, and write only to point out that appellant turned aside repeated opportunities before trial to limit the prejudice he now claims resulted from the jury learning that he or his confederate had shot the security guard during the North Carolina store robbery.

Preliminarily, the fact that appellant, either himself or jointly as an aider and abettor, used a gun to commit the North Carolina robbery that was the same weapon used to kill David Valentine a month earlier was undeniably probative evidence of his identity as Valentine's killer. The trial judge, in other words, was not compelled to rule that the circumstantial evidence appellant cites—the DNA on the clothing outside the store, and finding the murder weapon in the vent in Ward's North Carolina apartment—was an adequate substitute for evidence that placed the murder weapon in appellant's hand not long after the crime.

Nevertheless, the issue of whether the prosecutor needed to present evidence, either by testimony or via the store surveillance videotape, that appellant or Leaks had fired the gun or shot the security guard was the subject of repeated *in limine* discussions between Judge (now Chief Judge) Satterfield and the parties before the case was transferred to Judge Dixon for trial. From the beginning Judge Satterfield had been concerned to know how, if possible, the jury could be made to know that the gun had been used to carry out the North Carolina robbery but without learning that the gun had been fired, or at least that the store guard had been shot. He repeatedly ordered the attorneys to look for ways to "sanitize the prejudicial impact" of both a testimonial and video depiction of the robbery. In response, the prosecutor proposed, in writing, several alternatives including one that would have an eyewitness other than the security guard testify "that two armed bandits entered the premises shooting, but without eliciting that the victim was shot." And the prosecutor brought to court still-photographs from the surveillance video that purported to "show the two perpetrators committing the robbery, but do not show the victim being fired upon and struck." Yet, in response to Judge Satterfield's urging him to "[s]tart looking at the [proposed] alternatives," appellant's counsel rejected all of them because each "talks

about a robbery," when the defense's position was that "all evidence of the robbery is inadmissible" so that there was "no need to try to sanitize."

This notwithstanding, Judge Satterfield went another mile by inquiring whether the government's need "to really put those guns in the defendant's hands" in North Carolina could not be met by a stipulation that appellant had actually possessed the gun found in the vent in Ward's apartment. The prosecutor replied that he would want to "see the actual stipulation" to be sure it contained an admission that "those weapons were brought to North Carolina ... and put in that air vent by [appellant and Leaks] personally." But there the matter was left, because when the prosecutor at the next proceeding (the case having since been transferred to Judge Dixon) referred to Judge Satterfield's suggested stipulation that Jones had "had the gun and ... put it in the air vent," defense counsel was silent on the issue. Counsel did later propose, for the first time, that the shooting evidence could be limited to the fact "that the .45 was fired in the store" but not that "the firing took effect on another person," but he combined this with an insistence that "the fact that Mr. Jones confesses [to Devone Hines] to having shot the security guard" should also be excluded.

Judge Dixon ultimately allowed both videotape and testimonial evidence describing the North Carolina shooting, and it would overstate the evidence to say that his ruling was influenced by appellant's previous rejection of "sanitizing" measures short of exclusion. The fact remains, though, that Judge Satterfield, in weighing the *in limine* matter of admissibility, invited appellant to propose or join in alternatives that could have significantly lessened the prejudice he now insists denied him a fair trial. Indeed, the judge focused on and invited suggestions for avoiding the very prejudice appellant cites on appeal. See Reply Br. for App. at 8 ("the shooting evidence, not the robbery evidence, was more prejudicial than probative"). Since Judge Satterfield was not obliged to impose any of these alternatives *sua sponte* (much less to exclude the armed robbery evidence altogether), there is an element of self-inflicted pain in appellant's present complaint of prejudice, when he rejected the chance to shape the manner in which the proof was put before the jury.

To this Judge Ruiz replies mainly that it is not Judge Satterfield's action but Judge Dixon's "ruling that is challenged on appeal" (*post* at 1157) and that, in any case, it was the trial judge's responsibility, not the parties', "to control the admission of evidence and carefully balance its probative value and prejudicial effect" (*post* at 1157). But while both points are strictly correct, when viewed in the context of a case where appellant's help was actively sought to avoid unfair prejudice, they reduce to a sideshow key *in limine* hearings of the kind Judge Satterfield conducted.

RUIZ, Associate Judge, dissenting:

I cannot agree with the court's conclusion in Part III of the majority opinion that it was proper for the court to permit the government to introduce evidence of a different crime to the extent that was permitted in this trial. I believe that the trial court abused its discretion in admitting testimonial and visual evidence—detailed and highly prejudicial—of a totally unrelated armed robbery and shooting in North Carolina to prove the identity of the man who committed the charged murder in the District of Columbia through his possession, a month later, of the murder weapon. Because the danger of unfair prejudice posed by the admission of that evidence—in particular, the video of the

Check Into Cash armed robbery showing the shooting of a security guard—substantially outweighed its negligible probative value, the court erred in allowing the jury to consider it. I cannot conclude that the error was harmless and, therefore, I believe we should reverse appellant's convictions and remand for a new trial free of the taint of inadmissible prejudicial evidence of an unrelated, violent crime.

The majority reasons that evidence of the armed robbery and shooting in North Carolina was admissible (1) as an exception to the prohibition against the admission of other crimes evidence, to prove appellant's identity as the shooter in the District of Columbia by tying him to the weapon used in both crimes; (2) as direct evidence of the murder, to show that appellant had access to the murder weapon; and (3) to corroborate the testimony of appellant's cellmate, who said that appellant had confessed to the murder in the District and the armed robbery and shooting in North Carolina. For the reasons I discuss, I conclude that the evidence was either not probative on these points or, even if it had some relevance in making those points, the prejudice from the nature and extent of the evidence of the armed robbery and shooting in North Carolina that was presented to the jury substantially outweighed its probative value and cannot be said to have been harmless in the context of this trial.

## I. Other Crimes Evidence

"It is a principle of long standing in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew v. United States*, 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964) (emphasis omitted). "Since the likelihood that juries will make such an improper inference is high, courts *presume prejudice* and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose." *Busey v. United States*, 747 A.2d 1153, 1164 (D.C. 2000) (quoting *Drew*, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90) (emphasis added); *see also Green v. United States*, 440 A.2d 1005, 1006 (D.C.1982) ("It is well established that evidence of other crimes is inadmissible except for specified, limited purposes."); *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979) ("[U]nless the evidence of prior 'bad acts' is introduced for a legitimate purpose, its probative value is presumed to be outweighed by the prejudicial effect."). It is the government's burden to identify a legitimate purpose for introducing evidence of unrelated crimes. *See Johnson v. United States*, 683 A.2d 1087, 1101 (D.C.1996) (en banc) ("[W]hen evidence is correctly analyzed as coming within *Drew's* purview, 'the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions.'" (quoting *Thompson v. United States*, 546 A.2d 414, 424 n. 18 (D.C. 1988))). Even if the evidence is offered for a legitimate purpose, the trial court must always weigh the probative value of the evidence against the danger of unfair prejudice, and determine that "its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant." *Id.* at 1101 (quoting *United States v. Conners*, 825 F.2d 1384, 1390 (9th Cir.1987)). We have an "exclusionary" view of other crimes evidence, whereby the government bears the burden of showing that the evidence it seeks to admit falls within a recognized exception to our general prohibition. *See Wilson v. United States*, 690 A.2d 468, 471 n. 2 (D.C.1997) (citing *Thompson*, 546 A.2d at 424 n. 18).[1]

---

**1.** Contrarily, federal courts have interpreted Federal Rule of Evidence 404(b)—which is a

The majority's analysis, however, begins from the opposite view, suggesting that other crimes evidence is prohibited only where the prosecutor uses such evidence in an improper manner. But that conceptualization misapprehends the reason for our wariness to admit other crimes evidence by shifting the analysis from the impact of the evidence on the jury, where the emphasis properly lies, to the intent of the government in offering the evidence. *Cf. Drew,* 118 U.S.App.D.C. at 15, 331 F.2d at 89 ("[E]vidence of one crime is inadmissible to prove disposition to commit crime, *from which the jury may infer* that the defendant committed the crime charged." (emphasis added)). As our cases throughout the years bear out, other crimes evidence may be unfairly prejudicial even where the prosecutor did not intend to use it to show a predisposition to commit a crime. *See, e.g., Koonce v. United States,* 993 A.2d 544, 556–57 (D.C.2010) (finding evidence of past misdeeds improperly admitted where the government sought to admit evidence not to show predisposition, but simply as a " 'starting point' for eliciting testimony from … a difficult witness"); *Rindgo v. United States,* 411 A.2d 373, 377 (D.C.1980) (finding evidence prejudicial where the government sought to "provide relevant background information" about appellant's relationship with a testifying eyewitness). It is for that reason that in this case there is *presumptive* prejudice stemming from the admission of evidence of the North Carolina armed robbery and shooting of a security guard. *See Busey,* 747 A.2d at 1164. As a result, it was the government's burden to demonstrate that the other crimes evidence it

wished to present was not unfairly prejudicial. It did not meet that burden.

Given our lenient test for relevancy,[2] some of the evidence of the armed robbery and shooting in North Carolina was relevant to the identification of appellant as the assailant in the murder in the District of Columbia because it tended to establish appellant's identity because he possessed the murder weapon a month after the murder. Yet, not all relevant evidence is, or should be, admissible at trial. It is left to the trial court to filter what evidence should be permitted for the government to meet its burden and what evidence should be excluded as cumulative, prejudicial, or otherwise unsuitable for the jury's consideration. *Cf. Rodriguez v. United States,* 915 A.2d 380, 385 (D.C.2007) ("A trial judge has 'broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury.' " (quoting *Johnson v. United States,* 452 A.2d 959, 960 (D.C.1982))). Here, some evidence related to appellant's possession of the murder weapon, a month later, which was used in committing a crime in another state, was properly admissible under *Drew* to show appellant's identity. However, I believe that the trial court abused its discretion in allowing the government to present cumulative and unneeded—and highly prejudicial—evidence of appellant's participation in the armed robbery and shooting of the security guard in North Carolina.

In this case there were several colloquies about the purposes for which such evidence could be introduced. During the pre-trial phase, the prosecutor represented

---

codification similar to our general prohibition on other crimes evidence—as "a rule of inclusion rather than exclusion." *United States v. Bowie,* 344 U.S.App.D.C. 34, 40, 232 F.3d 923, 929 (2000).

2. "Relevant evidence is simply 'that which tends to make the existence or nonexistence of a [contested] fact more or less probable' than it would be without the evidence." *Busey,* 747 A.2d at 1165 (quoting *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977)).

to Judge Satterfield that without the evidence of the North Carolina armed robbery and shooting evidence tying appellant to the firearm, "all we have is the testimony of eyewitnesses that place [appellant and his co-perpetrator, Leaks] in the area where the gun was recovered. We don't have the guns in their hands. And we don't have forensic evidence, which is incredibly powerful." The prosecutor also informed the court that the evidence of the North Carolina robbery and shooting would "bolster[ ] and corroborate[ ]" the testimony of Hines, who said appellant had confessed to him about both the District and North Carolina crimes. Based on these representations, and sensitive to the prejudice that would result if the jury were informed that a person had been shot, Judge Satterfield stated that he would not allow the victim of the North Carolina shooting to testify, and ruled "that the government would be permitted to establish that a gun was fired ... without establishing though that somebody was shot." [3] He emphasized, however, that his determination could change (presumably, to exclude testimony about the North Carolina crime altogether) depending on whether the parties could agree to a stipulation "that connects those guns to the defendant."

Contrary to the government's argument that "we don't have forensic evidence," the government did, however, have compelling forensic evidence that "connected" appellant to the gun found in North Carolina, which in turn was matched to the weapon used in the murder in the District: an expert would testify that ballistics testing confirmed that one of the guns used in the North Carolina armed robbery and shooting was the weapon used in the D.C. murder, to the exclusion of any other weapon. Thus the identity of the weapon recovered in North Carolina and the murder weapon used in the District of Columbia was established by forensic evidence. The government then needed to link appellant to the weapon seized in North Carolina. That link was provided by three different pieces of evidence, each of which corroborated the other: (1) Ward, an online friend of appellant with whom appellant and Leaks had stayed in North Carolina, testified that two guns were recovered from the air vent of the room where they had been staying under false names. It was those guns that were test-fired, and one of which (a .45), expert testimony would establish, matched the weapon used in the armed robbery shooting in North Carolina and

**3.** Judge Satterfield emphatically expressed his views about what he considered undue prejudice in light of the evidence available to the government to prove appellant's identity:

THE COURT: Well, why can't you prove it without getting into the actual details of the robbery shooting?

. . .

You want to put the guns at that scene of the—those particular guns at—with the defendants at that scene through DNA evidence on clothing, plus ballistic evidence from the scene. You want to do it by bringing in somebody who is going to testify that they shot him. And then I have to tell the jury, you know, you heard that they shot him. But, you know, never mind, don't think of that as a pattern of any conduct by

them or to prove that they actually shot somebody up here, even though you've already heard that they shot that other man down there, because as the judge is going to tell you, you can only consider it for identity.

. . .

And then you want to bring it in through this witness who says he was shot. And I'm asking the government, and answer my question, why can't you sanitize it to the point of just saying that it was some kind of scene down there where they recovered these items of a robbery and then without having to do it through having a witness come in and say that he was shot with a gun in the chest?

the murder in D.C. (2) Appellant's cellmate Hines would testify that appellant told him that he and Leaks had stashed the guns in the vent and asked Hines to go get the guns when he was released from jail because appellant worried that he had forgotten to wipe his fingerprints from the gun. (3) In addition, should evidence of appellant's participation in the armed robbery be necessary to dispel any question whether appellant knew of the weapons in the air vent of the room where he had been staying, DNA analysis would prove that appellant's DNA matched a sample taken from one of the nylon masks used during the armed robbery in North Carolina where the gun was used.[4]

During trial before Judge Dixon, the prosecutor and appellant's trial counsel (who had not represented appellant at the pre-trial hearings) disagreed on the scope of Judge Satterfield's ruling. Judge Dixon heard arguments from both parties, including a proffer by the prosecutor of the evidence that he intended to show, and he reviewed the pre-trial hearing transcripts of Judge Satterfield's discussions. Although in pretrial discussions with Judge Satterfield, defense counsel had resisted admission of any evidence of the North Carolina armed robbery and shooting, at trial new defense counsel acknowledged that the government could present some evidence of the North Carolina crime to link appellant to the weapon in the D.C. murder. Specifically, counsel said that the government "can establish everything about connecting the .45 to [appellant] without either bringing out the fact that somebody was hit by the bullet, or the fact that [appellant] confesses to having shot the security guard. They can get the same effect by simply saying that [appel-

lant] fired the .45 in the store, and they can do that without the statement [i.e., appellant's confession to shooting the security guard] because they have the bullets and the shell casings." The prosecutor expressed concern about having witnesses—"who [are] not the most sophisticated" people—"tip-toe" around the shooting of the security guard the defense wanted to redact. Judge Dixon echoed the prosecutor's concern, stating that "I can't see trying to sanitize both the North Carolina incident and the jailhouse statement without doing terrific prejudice to the evidence." He ultimately ruled that the government could present evidence of a "nonfatal" shooting in North Carolina, but without making a definitive determination on how the government could do so.

Judge Satterfield, during pre-trial discussions, and Judge Dixon, during trial, did not delineate what evidence could be presented to satisfy the government's burden to establish appellant's identity using evidence of another crime, and what evidence was redundant and unduly prejudicial, in light of *Drew's* strictures on the use of such evidence. Although Judge Satterfield had excluded the security guard from testifying, he had suggested—without saying how—that the government could establish that "a gun was fired" during the robbery. Once the case came to trial before Judge Dixon, defense counsel agreed that the government could present evidence to establish that appellant had fired a gun in the North Carolina robbery. But, not only was the government permitted to "establish" that appellant had fired one of the two guns used in the North Carolina robbery (appellant could not be specifically tied to the .45), it also was able to present detailed testimony from the manager of

---

4. The store manager testified that both robbers were masked. DNA from a brown knit cap matched the DNA of Leaks. The knit cap matched to Leaks's DNA and the nylon cloth linked to appellant's DNA were recovered behind the store immediately after the robbery.

the Check Into Cash store who described the armed robbery and shooting of the security guard, and then repeated it, by introducing and showing to the jury in open court a video of the actual robbery and shooting, narrated by the store manager. Although defense counsel had suggested a less inflammatory means to make the desired connection between appellant and the gun, i.e., by establishing that appellant had fired the gun in the North Carolina robbery and that forensic evidence linked that gun to the murder in D.C., Judge Dixon was more preoccupied with the effect of any sanitization on the government's unimpeded use of the evidence than on the prejudicial effect that a full presentation of the unsanitized evidence would have on appellant. As a result, the sheer quantum of evidence offered by the government exceeded by far what the government needed to prove identity, and greatly increased the likelihood that the jury would use the evidence against appellant in an improper manner.

The majority and concurring opinions imply that because appellant was not willing to stipulate that he had the murder weapon a month after the murder in North Carolina and had initially wanted to exclude evidence of the armed robbery and shooting in North Carolina from the trial altogether, counsel bears responsibility for the wholesale admission of the other crimes evidence of the armed robbery and shooting in North Carolina. These arguments go too far. First, the government, as the proponent of the other crimes evidence, did not offer a stipulation that would have addressed the specific issue of possession of the murder weapon that it validly needed to establish. Second, regardless of the parties' positions to gain maximum advantage, and even though counsel's constructive collaboration can assist the judge in arriving at a proper balance in deciding on the nature and quantum of evidence to be admitted, it remains the trial court's responsibility to control the admission of evidence and carefully balance its probative value and prejudicial effect. *See, e.g., Johnson,* 683 A.2d at 1095.

Even if, as Judge Farrell suggests in his concurrence, the absence of such collaboration by counsel could be a factor in our review of the judge's weighing of the evidence for abuse of discretion, here the record does not support that defense counsel did not provide clear objection and an acceptable alternative to the trial court. Just as two different judges dealt with this issue, one pretrial and another at trial, there also were two different defense counsel, one who handled the pretrial colloquies before Judge Satterfield and a different counsel, who tried the case before Judge Dixon. I agree with the majority that Judge Satterfield's pretrial ruling was not law of the case binding on Judge Dixon. That means the issue was for Judge Dixon to resolve and that is the ruling that is challenged on appeal. At that time, defense counsel conceded that the government could establish appellant's subsequent possession of the murder weapon in North Carolina through the testimony of Ward, the expert testimony on ballistics testing that conclusively identified the weapon recovered from appellant's bedroom in North Carolina as one and the same as the D.C. murder weapon, and the DNA evidence that matched appellant's DNA to a sample recovered from a piece of cloth used as a mask in the armed robbery. In fact, defense counsel went as far as stating that the government could present evidence that appellant had "fired" the gun. But where counsel clearly drew the line was against admitting evidence that "somebody was hit by the bullet, or the fact that [appellant] confesses to having shot the security guard." Counsel

could not have been clearer as to what evidence of the North Carolina armed robbery should and should not be admitted.

The court should have balanced the government's legitimate use of the evidence against the defense's clearly stated concern about its prejudicial impact. In light of the testimony of the firearms experts, who testified with "absolute certainty" that ballistics testing of the .45 recovered in Ward's house matched bullets recovered from the scenes of the District and North Carolina crimes, to the exclusion of "all other possible firearms," what was necessary to establish identity was to connect appellant to the gun that was used in the North Carolina shooting. As already noted, the government had ample means at its disposal to this end. Moreover, evidence cannot be considered in isolation; the probative value of particular evidence depends on what other evidence proves the same point. Here, the issue was appellant's identity as the shooter in the murder in D.C. Evidence of the North Carolina crimes was used to establish *indirectly* appellant's identity through his possession of the murder weapon thirty days after the murder. But here, there was *direct* evidence that appellant had murdered Valentine: Davis, an eyewitness, positively identified appellant in-court and from a photo array, as the shooter. And appellant had confessed to Hines that he murdered Valentine.

I recognize that in light of the government's high burden of proof, we do not require the government to present its case in such a cramped and disembodied manner that renders its case only sufficient and leaves the jury guessing about the source of the government's evidence or the weight of its case to prove guilt beyond a reasonable doubt. But the essential duty of the trial judge in a criminal case is to control the throttle of relevant evidence to ensure the fairness of the proceeding. *Cf. Caufield v. Stark,* 893 A.2d 970, 980 (D.C. 2006) ("The determination of what evidence is relevant, and what evidence may tend to confuse the jury, is left to the sound discretion of the trial court." (quoting *Turcios v. United States Servs. Indus.,* 680 A.2d 1023, 1030 (D.C.1996))). In all cases, the court must weight probative value against prejudice. *Johnson,* 683 A.2d at 1095 ("[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court...."). That responsibility requires particular scrutiny in the case of presumptively prejudicial other crimes evidence. In this case, although some evidence of the North Carolina armed robbery was certainly probative on the issue of identity within the strictures of *Drew,* the trial court abused its discretion in permitting the government to introduce much more evidence—and highly prejudicial evidence—than was needed to meet its burden.

The evidence that was probative was evidence that, in the words of Judge Satterfield, "connected" the guns used in North Carolina to appellant. That "connection" was necessary in order to establish two distinct but interrelated points relevant to the charged crime: appellant's identity, and the fact that appellant had access to the instrumentality used in the murder, an issue I discuss below. Admission of evidence that appellant used the gun to shoot a security guard did not add any probative weight to either the issue of identity or access to the instrumentality used in the murder in D.C. It served only to show that appellant is a dangerous person prone to engage in violent, unprovoked acts. The fact that appellant used the weapon to shoot a person in an unrelated violent crime, therefore, necessarily substantially outweighed its probative value. In this case, the admission of evidence of

another unrelated crime without careful examination of what was probative and what was unduly prejudicial, allowed the *Drew* exception to swallow the rule.

In addition to determining *what* evidence is probative, the trial court must also weigh *how* such evidence should be presented. Judge Satterfield properly determined, over the government's objection, that testimony by the security guard, the victim of the shooting, would be unnecessarily prejudicial. Instead, Judge Dixon permitted the store manager, an eyewitness, to testify about the armed robbery *and* the shooting. In addition to her testimony, the government was permitted to introduce the security camera video that recorded the crime, during which the store manager repeated her testimony as she narrated the images seen on the video. The store manager's testimony about the shooting of the security guard was irrelevant and highly prejudicial; it should have been excluded. The video, a low-quality black-and-white security camera footage, had negligible probative value in establishing appellant's identity or in tying him to the gun used in the D.C. murder, and because it vividly showed the actual armed robbery and shooting of the security guard, was likely even more prejudicial; it should have been excluded. Although the video does not help the jury identify appellant or the gun used in the robbery, it does unmistakably show that the robbers came into the store with guns blazing and that the security guard was shot without provocation.[5] It was not necessary for the jury to strain to make out the actions in the low-quality video because Geil, the store manager, provided a running narrative of the video from the witness stand. She testified that "as soon as [appellant and Leaks] came in the door, they were shooting. And they shot [the security guard] right down." Geil repeated her account of the robbery as she provided a narrative for the video being shown to the jury, and the video was paused to allow her to explain details of the scene to the jury, including an explanation of where the security guard appears on the screen and how it is that she was able to see what happened to him after he was shot. When asked what had happened to the guard, Geil said he had "survived."

In short, whatever probative value Geil's testimony about the shooting of the security guard and the video contributed to tie appellant to the gun that was used both in North Carolina and D.C. was negligible at best because the government had in its quiver other, more substantial evidence that would prove the ultimate issue of the identity of the D.C. shooter. With the DNA match and the unequivocal expert testimony on the ballistics testing, there

---

**5.** Contrary to the majority opinion's characterization, the video is virtually worthless in identifying appellant as one of the perpetrators. Both robbers were masked; according to the store manager, they were covered from "head to toe." Moreover, the camera's perspective is such that it is virtually impossible to tell which one is the "stockier, shorter" one (presumably appellant), and, because the video is black-and-white, it is difficult to tell which of the robbers wore the "light blue" shirt the store manager said the shorter man wore. It is impossible to identify the weapons in the robbers' hands. What the video clearly shows is the security guard being shot.

As the video starts, about two-thirds of the guard's body is visible in the lower-right portion of the screen; the guard then leans into the frame and his head is fully in view; as the robbers enter the store, a flash of light is seen coming from the gun of one of the robbers in the direction of the security guard, and the guard falls from the frame; there ensues a chaotic scene in which the robbers quickly collect the money, after which store employees are seen going to the place where the guard fell; finally, when an officer arrives on scene, he goes directly to the spot where the guard fell.

was simply no need for the jury to view the video of the robbery to try to guess whether appellant was the "shorter, stockier" of the two robbers on the tape, as the government argued was necessary. The video was also unnecessary to establish that appellant was shorter and stockier than Leaks, because the physical differences between the two men were clearly established by eyewitness Davis, who not only described appellant's build and compared it to Leaks's (who was Davis's neighbor), but positively identified appellant from a photo array and in court as the person who shot Valentine in the District of Columbia. Because the other crimes evidence presented a high likelihood that the jury would make an improper inference of criminal propensity without countervailing probative value, the trial court should have carefully examined the legitimate, probative value of the evidence, and then limited the government's presentation to only probative evidence, excluding, as defense counsel requested, non-probative evidence, of the shooting of the security guard that would unduly prejudice appellant. *See Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). In failing to do so, and permitting an unrestricted avalanche of prejudicial evidence of an unrelated crime, the trial judge abused discretion.

## II. Direct Evidence of Charged Crime

In addition to being admissible under *Drew* (subject to proper limitations) to prove identity, some evidence of the North Carolina armed robbery was admissible because it was relevant to the charged murder to establish appellant's possession of the instrumentality used in committing the crime, in this case, the .45. Here, this ground overlaps with use of the evidence to show identity under *Drew,* but under our cases it rests on a separate analysis. *See Johnson,* 683 A.2d at 1098 ("*Drew* does not apply where such evidence ... is direct and substantial proof of the charged crime...."). We have generally required the government to show that the defendant possessed the instrumentality *prior to* the commission of the crime, or relatively soon thereafter. *See, e.g., Thomas v. United States,* 978 A.2d 1211, 1240 (D.C. 2009) (upholding the admission of evidence that the defendant possessed the firearm four days after the shooting);[6] *Busey,* 747 A.2d at 1165 ("An accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." (quoting *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977))).[7] Our rationale for allowing the admission of such evidence lies in the reasonableness of the inference that a defendant who had access to the weapon soon before or after the crime is likely to have had access to it

---

6. *See also Millard v. United States,* 967 A.2d 155, 165 (D.C.2009) (hypothesizing that if "police had discovered extra ammunition or a gun holster in appellant's home on February 10, 2005, the government could be expected to argue—with justification—that such evidence makes it likely that appellant had access to a gun and 'more probable' that he possessed one on February 9, 2005, the day of his arrest").

7. *See also Jackson v. United States,* 623 A.2d 571, 587 (D.C.1993) ("An accused's prior possession of the physical means of committing a crime is admissible."); *Marshall v. United States,* 623 A.2d 551, 554 (D.C.1992) (finding no error in the admission of evidence that the defendant possessed the firearm used in the murder two months before the killing).

at the time of the crime. *See Thomas,* 978 A.2d at 1240; *Busey,* 747 A.2d at 1165. For example, in *Busey,* the government presented evidence that the defendant had possessed a .38 caliber gun—the same caliber weapon used in the charged crime— two days before the murder. *Id.* We explained that the "evidence established only a reasonable probability, and not a certainty" that the defendant possessed the gun at the time of the murder, and that the lack of certainty only affected the weight of the evidence, not its admissibility. *Id.*

Here, expert testimony established that the weapon used in the armed robbery and shooting in North Carolina matched the one used in the murder in the District of Columbia. Even though testimony that the same gun was used both times increased the gun's probative value, the important inference was that the same person had the gun at both times. The strength of that inference was diminished by the fact that the gun could be linked to appellant only one of those times, at the site of an unrelated crime that took place in a different state, *thirty days later.* Notwithstanding the time and geographical distance between the two crimes, even if one assumes evidence that appellant had the murder weapon in North Carolina showed a "reasonable probability" that appellant had access to the same gun in the District of Columbia thirty days earlier, *Busey,* 747 A.2d at 1165, the probative force of that inference was not dependent on showing that appellant had *used* the gun during the subsequent armed robbery to shoot a security guard. As *Busey* makes clear, the trial court must carefully weigh the probative value of the evidence against its prejudicial danger, and excise the "inflammatory" and indirect contextual details of the defendant's prior or subsequent possession of the firearm. *Id.* at 1165–66. Only if the defense opens the door by challenging the substance of the

evidence that the defendant possessed the weapon used in the charged crime at a another proximate time and place may the government present the context of the other possession to "rehabilitate" the evidence's probative potential. *Id.* But, here, the court did not restrict in the first instance the government's evidence to the fact of appellant's subsequent possession of the murder weapon. Indeed, without any challenge to admission of evidence of appellant's subsequent possession of the murder weapon (which defense counsel acknowledged was admissible), the court allowed the government to introduce, without limitation, substantial details beyond appellant's possession of the gun, including the use of the weapon in an armed robbery and shooting of a security guard, through testimony and a video. All of this evidence was allowed during the government's case-in-chief and before the defense had risked "opening the door" to inflammatory contextual details about the armed robbery and shooting. In light of the potential for prejudice to the defendant, the trial court should have better regulated the scope and manner of the evidence of an unrelated crime in light of its specific, legitimate purpose.

As should be clear, evidence of the North Carolina armed robbery and shooting was not admissible under *Johnson* as direct evidence because it was neither "closely intertwined with" the Valentine murder nor "necessary to place the charged crime in context." *Johnson,* 683 A.2d at 1098. In *Johnson,* evidence of the gruesome murder of two boys in Maryland was admitted in the prosecution for a murder in the District because "[t]he same gun was used in both, they occurred close to one another in time—the second occurring in part arguably as a consequence of the first—and they tend to prove one another, for the cogent reason (among others) that

the perpetrators of each were known to the two Maryland victims, and for that reason killed them." *Id.* Here, on the other hand, there was no connection established between the District of Columbia murder and the North Carolina armed robbery and shooting, except for the identity of the perpetrators and one of the weapons used. Unlike in *Johnson*, the two crimes were separated by a month in time and a couple hundred miles in distance, and one did not provide the motive for the other. *Cf. id.* at 1098 n. 11 ("We note that the evidence of the Maryland murders bears an immediate relationship to the charged offenses, both temporally and causally, that is especially strong.... This circumstance weighs heavily in the balance against prejudice."). The only relevance of the North Carolina armed robbery and shooting to the prosecution's case in the District murder was to argue that appellant was the assailant here because a month later he had the same gun in North Carolina. With such a tenuous connection between the two crimes, the evidence of the North Carolina armed robbery and shooting is not, as in *Johnson*, "direct and substantial proof" of the District murder. *See id.* at 1095 n. 8 (noting that "a variety of matters" must be assessed in weighing the probative value of other crimes evidence against its prejudicial danger, including "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will rouse the jury to overmastering hostility." (quoting John Strong, McCormick on Evidence § 190 (4th ed.1992))).

## III. Corroboration

Finally, I disagree with the majority's *sua sponte* reasoning (the government does not make this argument in its brief) that the entirety of the evidence of the North Carolina armed robbery and shooting was admissible to corroborate Hines's testimony that appellant had confessed to him about the murder in the District of Columbia. This basis for the majority's conclusion is that "evidence of other crimes or acts is admissible to corroborate evidence that *itself has a legitimate non-propensity purpose.*" *Ante* at 1146 (quoting *United States v. Bowie*, 344 U.S.App. D.C. 34, 44, 232 F.3d 923, 933 (2000)). Thus, in *Bowie*, the court permitted other crimes evidence (additional seized counterfeit currency) that was closely linked to the substance of the defendant's confession for the charged crimes of possession of counterfeit currency. 344 U.S.App.D.C. at 44, 232 F.3d at 933. The D.C. Circuit noted in passing, that "[s]ome courts have imposed additional requirements for bad acts evidence introduced for the purpose of corroboration, requiring that the corroboration be direct and the corroborated matter be significant." *Id.* at 44 n. 7, 232 F.3d at 933 n. 7 (citing *United States v. Everett*, 825 F.2d 658, 660 (2d Cir.1987); *United States v. Pitts*, 6 F.3d 1366, 1370–71 (9th Cir.1993)). The court declined to adopt such a rule, finding that the concerns could be adequately addressed by the balancing test in Federal Rule of Evidence 403. *Id.* Neither the majority opinion nor the government cites a case in which we have considered the circumstances under which it is appropriate to permit evidence of an unrelated crime to corroborate other properly admissible evidence.[8] In my view, the use of other

---

8. *Minick v. United States*, 506 A.2d 1115 (D.C. 1986), relied upon by the majority, is inapposite because it did not involve the admission of extraneous evidence of another crime to corroborate properly admitted evidence. In *Minick*, a wallet with parole papers in the

crimes evidence for such a purpose in this case compels the cautionary rule noted in *Bowie*. Here, the government's purpose was to corroborate Hines's testimony that appellant confessed to the District murder (a legitimate purpose), but it sought to do so by corroborating Hines's testimony about appellant's confession to the North Carolina armed robbery and shooting, which as an uncharged and unrelated crime was extraneous, and prejudicial, and, therefore, an illegitimate purpose. The majority's argument seems to be that if Hines's testimony about appellant's confession to the North Carolina crimes could be corroborated, then his testimony about appellant's confession to the murder in the District would likewise be more credible. Evidence of jail confessions offered by a person in a position to benefit from assisting the prosecution is always subject to serious questions and it is understandable that the prosecutor wished to shore it up. Yet, where the corroborative evidence concerns a crime that is distinct in nature, and is not proximate in time or space to the charged offense, careful attention must be paid to the possible misuse of the evidence by the jury. The other crimes evidence that was admitted in this case did not simply "corroborate" the legitimate purposes of Hines's testimony about the charged murder, as in *Bowie*, but was used to prove the truth of Hines's testimony that appellant had committed a different crime, to which he also confessed, and added prejudicial details about an unrelated armed robbery and shooting. As was the case with use of the evidence to establish identity under *Drew* or to prove that appellant had access to the murder weapon, the quantum of evidence about the crimes in North Carolina was out of proportion to what would have been sufficient to corroborate Hines's testimony about appellant's confession, and, therefore, failed FRE 403's balancing test.

## IV. Prejudice

What remains is whether the court's erroneous admission of unredacted evidence of the armed robbery and shooting was harmless. The government wisely refrains from arguing harmless error in its

defendant's name was found "within approximately one hour of the estimated time of the victim's rape and murder ... approximately twenty five feet" from the body of the victim. *Id.* at 1118. Appellant had argued that his wallet had been lost "for several days" before the crime was committed. *Id.* The question for the court was whether the parole documents could be introduced to establish the defendant's identity as the perpetrator—there was no witness to the crime—including through the testimony of two witnesses who saw the defendant with the parole papers found in the wallet "a few hours before" the crime. *Id.* The parole papers, in short, were evidence found at the crime scene and were shown to witnesses who identified them as the same papers the defendant had in his wallet just before the crime. Even though the papers were direct evidence of the charged crime, the court analyzed their admissibility as other crimes evidence. The court concluded they were admissible because the govern-

ment did not have "ample other evidence establishing the identity of the assailant" making them "highly probative evidence of a material fact in issue," *id.* at 1119, and potential prejudice was "diminished" as the papers "did not contain any reference to the [other] crime the defendant had committed," *id.* at 1120. The differences with this case are obvious; here, the government had ample other evidence identifying appellant as the shooter in the District, evidence about the North Carolina crimes was extraneous to the murder in the District, and a great amount of detail about the North Carolina crimes was admitted.

The majority opinion also cites *Strozier v. United States*, 991 A.2d 778 (D.C.2010). *Strozier* also is inapposite as it did not involve evidence of an unrelated crime. The issue in *Strozier* was the admissibility of an autopsy photograph of the victim of the charged crime, to address an issue that the defendant had contested. *Id.* at 794.

brief, and that could be the end of the discussion. It should be clear that in light of the sheer volume and detail of the evidence of the violent armed robbery and shooting—made particularly impactful by the video—it is impossible to conclude with any confidence that the jury was not substantially swayed by the evidence of the North Carolina crimes. Notwithstanding the judge's limiting instructions to the jury, no amount of cautionary proclamations can unring a bell that has been struck as loudly as it was in this case. Moreover, the government's closing argument went beyond the parameters of the limiting instruction about the proper uses of the other crimes evidence, solely to establish identity and access to the murder weapon. The government's closing argument began, not as one would have expected, with Davis's eyewitness testimony positively identifying appellant as the man who shot Valentine. Instead, the prosecutor referred to appellant as the "mystery man" Davis saw with Leaks during the murder and then described appellant's "partnership" with Leaks in fleeing (with false names) to North Carolina, where they together committed the armed robbery, and again together, escaped from D.C. jail the following year. Only then did the prosecutor mention Davis's positive identifications of appellant as the shooter. In closing argument, the prosecutor twice referred to the armed robbery and also mentioned the shooting of the security guard in North Carolina. In rebuttal, the prosecutor responded to defense counsel's closing argument that "nobody s[aw]" appellant with a gun when Valentine was shot in the District, by directing the jury's attention to the crime in North Carolina: "Ed Davis saw him with a gun. Do you want to see him with a gun? Watch the video from the Check Into Cash." As already discussed, the video in no way assisted the jury in establishing that appel-

lant had the gun used in the District of Columbia murder the previous month, a fact that was established by expert testimony on ballistics and DNA testing, independent of the video. By pointing the jury's attention to the video, the prosecutor highlighted that appellant had committed an armed robbery at another time and place during which he and his same companion in Valentine's murder had terrorized store employees and shot a guard without provocation. By emphasizing the video, the prosecutor's rebuttal crossed the line, arguing that appellant's use of a weapon to commit a violent crime in North Carolina proved that he also used a gun to murder Valentine in the District.

The prejudicial impact of the unregulated admission of evidence of an unrelated crime, particularly when viewed in the context of the expert's exaggerated "one-hundred percent" certainty about the ballistics testing and the prosecutor's closing argument and rebuttal, leads me to conclude that the improperly admitted evidence could well have substantially swayed the jury's verdict. I would reverse and remand for a new trial that properly limited both the evidence of the unrelated crimes in North Carolina and the degree of certainty expressed by the ballistics experts.